1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   Olivia Valadez, successor in interest to the
     Estate of Eric Valadez,
11                                                    No. 1:22-cv-00263 KJM EPG
12                     Plaintiff,                     ORDER
13          v.
14   Sutter Health Memorial Hospital Los Banos, et
     al.,
15
                       Defendants.
16

17          Olivia Valadez alleges Sutter Health Memorial Hospital Los Banos and DOES 1–20[1]

18   (collectively the Hospital) violated federal and California laws when it negligently allowed her

19   son Eric Valadez (Valadez) to escape the hospital, after which he committed suicide.  Both parties

20   bring partial motions for summary judgment.  As part of her motion, plaintiff requests the court

21   take judicial notice of the California Department of Public Health Licensing and Certification's

22   (DHLC) 2021 Deficiencies Report on the Hospital.  Defendants move to strike plaintiff's

23   additional statement of facts in support of her motion for summary judgment.  As described more

24   fully below, the court **grants in part** and **denies** in part plaintiff's motion for

25   /////

---

[1] Valadez named DOES 1-20 as defendants as well, but has not moved to substitute
named individuals in their stead.  The court thus **dismisses** all DOE defendants without prejudice.
*See* Fed. R. Civ. P. 4(m) (providing for dismissal if a defendant not served within 90 days after
complaint filed); *see also* Fed. R. Civ. P. 10(a) (complaint must "name all the parties").

1

1  summary judgment, **grants in part and denies in part** the Hospital's motion for summary

2  judgment, **grants** plaintiff's request for judicial notice and **grants** the Hospital's motion to strike.

3  **I.      PROCEDURAL BACKGROUND**

4        Plaintiff filed suit against the Hospital on March 3, 2022.  *See* Compl., ECF No. 2.

5  Plaintiff alleges the Hospital violated the Emergency Medical Treatment and Active Labor Act

6  (EMTALA), 42 U.S.C. § 1395dd, by failing to screen and by failing to stabilize Valadez when it

7  treated him on March 21-22, 2021, *Compl.* ¶¶ 26–34; the Americans with Disabilities Act (ADA),

8  42 U.S.C. §§ 12181–12189, *id.* ¶¶ 17–25; California's Unruh Civil Rights Act (Unruh Act), Cal.

9  Civ. Code § 51, *id.* ¶¶ 35–45, and California's Disabled Person's Act (CDPA), Cal. Civ. Code

10  § 54, *id.* ¶¶ 46–56.  Plaintiff also alleges the Hospital committed negligence per se.  *Id.* ¶¶ 57–66.

11  Plaintiff seeks general and special damages, statutory damages, punitive damages, injunctive

12  relief and attorneys' fees.  *See id.* (Prayer for Relief).

13        Both parties have moved for partial summary judgment on all plaintiff's claims except her

14  negligence per se claim.  *See* Def.'s Mot. Summ. J., ECF No. 46; Pl.'s Mot. Summ. J., ECF No.

15  57.  The Hospital argues it did not violate EMTALA because it properly screened Valadez and

16  because Valadez left the Hospital before the Hospital could transfer him and therefore

17  EMTALA's stabilization requirement was inapplicable.  *See* Def.'s Mem. at 11–14, ECF No. 47.[2]

18  The Hospital also argues plaintiff's ADA, Unruh Act and CDPA claims fail as a matter of law

19  because plaintiff argues only that Valadez received poor care for his psychiatric disability and not

20  because he was denied access to a public accommodation.  *See id.* at 14–17.  Meanwhile plaintiff

21  claims it is undisputed the Hospital violated EMTALA by providing an incorrect screening of

22  Valadez's suicidal ideation, and the Hospital failed to stabilize Valadez by not giving him

23  medication, by not properly supervising him and by placing him in a dangerous hallway.  *See*

24  Pl.'s Mem. at 17–23, ECF No. 57-1.  Plaintiff also argues it is undisputed the Hospital failed to

25  accommodate Valadez's disability, mostly through its poor medical treatment on March 21–22,

_____

[2] Pages cited here are those applied at the top right by the CM/ECF system with the exception of deposition transcripts.  The court cites depositions to the original page numbers of the deposition transcript.

1    2021, and thus violated Title III of the ADA.  *See id.* at 13–16.  Plaintiff further argues that

2    because the Hospital violated the ADA it also violated the Unruh Act and the CDPA. *See id.* at

3    23–26.

4         Both motions are fully briefed.  *See* Def.'s Mem; Pl.'s Opp'n, ECF No. 72; Def.'s Reply,

5    ECF No. 83; Pl.'s Mem; Def.'s Opp'n, ECF No. 61; Pl.'s Reply, ECF No. 80.  In addition to her

6    motion for summary judgment, plaintiff asks the court take judicial notice of the DHLC's 2021

7    report on the Hospital.  *See* Req. Jud. Notice, ECF No. 58.  The Hospital opposes plaintiff's

8    request.  *See* Def.'s Response, ECF No. 62.  As part of her motion for summary judgment,

9    plaintiff also has submitted an additional statement of undisputed material facts with her reply

10   brief.  *See* ECF No. 81.  The Hospital requests the court strike this filing, s*ee* Def.'s Mot. Strike,

11   ECF No. 82, arguing it violates this court's local rules as well as the Federal Rules of Civil

12   Procedure, *see id.* at 1–3.

13        On October 11, 2024, this case was reassigned to the undersigned.  *See* Order, ECF No.

14   86.  On May 8, 2025, the court heard oral argument on the pending summary judgment motions.

15   Jeremy Dobbins appeared for plaintiff.  *See* Mins. Mot. Hr'g, ECF No. 92.  Aaron Schultz

16   appeared for the Hospital.  *See id.*  At hearing, the court directed the parties to file supplemental

17   briefing on *Harmon v. Uintah Basin Medical Center*, No. 20-0669, 2021 WL 2532826 (D. Utah

18   June 21, 2021), a case the court identified as being relevant to plaintiff's EMTALA duty to

19   stabilize claim, *see id*.  Both parties have submitted their supplemental briefs and the court has

20   submitted the matters, which it resolves here.  *See* Pl.'s Suppl. Br., ECF No. 93; Def.'s Suppl. Br.,

21   ECF No. 94.

22   **II.    CLARIFYING THE RECORD: OBJECTIONS, JUDICIAL NOTICE**

23        The parties have both submitted evidence in support of their motions and in opposition to

24   their opponent's motion.  The court first resolves several disputes regarding these submissions.

25   First, the Hospital has raised several objections in addition to making its motion to strike based on

26   plaintiff's submitted statements of facts.  *See* Def.'s Reply at 4–5; Def.'s Opp'n at 7–9; Def.'s

27   Mot. Strike.  Second, plaintiff has requested the court take judicial notice of the DHLC's 2021

28   Deficiencies Report on the Hospital in support of its motion for summary judgment.  *See* Req.

1    Jud. Notice.  Third, the Hospital has made evidentiary objections to almost all of plaintiff's

2    submitted evidence both in opposition to the Hospital's motion for summary judgment and in

3    support of her own motion for summary judgment.  *See* Def.'s Objs. Pl.'s Mot. Summ. J. (Objs.

4    No. 1), ECF No. 65; Def.'s Objs Pl.'s Opp'n Def.'s Mot. Summ. J. (Objs. No. 2), ECF No. 84.

5    The court addresses each dispute in turn.

6         **A.    Local Rule 260**

7         Under Federal Rule of Civil Procedure 56, litigants who move for or oppose summary

8    judgment must cite "particular parts of materials in the record" to show specific facts are

9    disputed, undisputed or cannot be proved, as the case may be.  *See* Fed. R. Civ. P. 56(c)(1).  This

10   district's local rules implement that rule by requiring a separate statement proposing undisputed

11   facts.  *See* E.D. Cal. L.R. 260(a).  The separate statement must "cite the particular portions" of the

12   record that establish each proposed fact as "undisputed."  *Id.*  The opposing party must then

13   respond to each proposed fact on the list and either admit or deny the fact is undisputed.  *See*

14   E.D. Cal. L.R. 260(b).  If the opposing party contends the fact is disputed, it must cite "the

15   specific particular portions" of the record showing the fact is disputed.  *Id.*

16        The Hospital makes two objections arguing plaintiff did not abide by Local Rule 260.

17   First, the Hospital argues plaintiff violated Local Rule 260 because she failed to file a separate

18   statement of disputed facts in opposition to the Hospital's motion for summary judgment.  *See*

19   Def.'s Reply at 4–5.  Second, the Hospital argues plaintiff violated Local Rule 260 in her

20   statement of undisputed facts for her motion for summary judgment because her listed facts do

21   not fully encompass all the facts plaintiff relies on in her memorandum of points and authorities

22   in support of summary judgment.  *See* Def.'s Opp'n at 7–9.  As to the first objection, Local Rule

23   260 does not require parties in opposition to submit statements of disputed facts, *see* E.D. Cal.

24   L.R. 260(b), so plaintiff did not violate Local Rule 260 by omitting one.  As to the second

25   objection, the court has had no problem finding the evidence cited by the plaintiff in her motion

26   for summary judgment and the Hospital has been able to respond to plaintiff's facts in its own

27   opposition.  Thus, even if plaintiff's statement of facts is deficient, the Hospital is not prejudiced.

28   The Hospital's objections in this respect are overruled.

4

Perhaps in a belated attempt to remedy her statement of facts, plaintiff has submitted an additional statement of facts to support her motion for summary judgment. *See* Pl.'s Add'l Stmt. Undisp. Facts. The Hospital has moved to strike this filing, arguing it does not abide by the local rules of this district or by the Federal Rules of Civil Procedure. *See* Def.'s Mot. Strike at 1–2. As the Hospital points out, Local Rule 260(a) allows the moving party for summary judgment to file a statement of undisputed facts. *See id.* at 2 (citing E.D. Cal. L.R. 260(a)). Local Rule 260(b) allows the party opposing summary judgment the opportunity to file a separate statement of disputed facts. *See id.* (citing E.D. Cal. L.R. 260(b)). The local rules do not allow the moving party to file an additional statement of facts in their reply brief. The Hospital would be prejudiced by this filing as it has not had an opportunity to dispute plaintiff's additional statement of facts. The court grants the Hospital's motion to strike the additional statement of facts.

### B.    Judicial Notice

A judicially noticed fact is a "fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is not subject to reasonable dispute if it is generally known or if it can be accurately and readily determined from sources whose authority cannot reasonably be questioned. *See id.* The court must take judicial notice "if a party requests it and the court is supplied with the necessary information." *Id.* 201(c)(2). Regarding the nature of the documents covered by plaintiff's request, "[j]udicial notice is appropriate for [such] records and 'reports of administrative bodies,'" because their authority usually cannot reasonably be questioned. *Grant v. Aurora Loan Servs.*, 736 F. Supp. 2d 1257, 1263 (N.D. Cal. 2010) (quoting *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008)).

The court takes judicial notice of the existence of the DHLC's 2021 Deficiencies Report of the Hospital. As plaintiff points out, the report was completed by a California agency and is available online; there is no reason to question its authenticity.[3] However, as the Hospital points out, the report contains hearsay, especially the interviews embedded within it, and plaintiff has

---

[3] *See* http://www.cdph.ca.gov/Programs/CHCQ/LCP/CalHealthFind/Pages/ASPEN_FEDERAL_2567. aspx?EventID=GJH011 (last accessed June. 11, 2025).

1  not made any attempt to show what if any exception might apply to allow in some of the report's

2  contents.  Def.'s Response at 2–3.  Further, while the court finds that while plaintiff almost

3  certainly could transform at least some of the DHLC's interviews and conclusions based on those

4  interviews into admissible evidence at trial, as currently presented certain details of the report

5  involving the care of Valadez are inadmissible.  The interview content has not been confirmed

6  through deposition testimony that would allow the court to treat that content as undisputed

7  evidence.  *See* Req. Jud. Notice Ex. A (DHLC Rep.) at 17–24.  The court thus takes judicial

8  notice of the existence of the report, that the conclusions rest on interviews conducted with the

9  Hospital's staff in April 2021, and that the report investigated Valadez's stay at the hospital.  The

10  court, however, does not take judicial notice of the interview content embedded in the report or

11  any conclusions based on such interviews because as currently constituted it is hearsay and

12  subject to dispute.

13     **C.    Objections**

14         The Hospital makes three other types of objections in both its objections to plaintiff's

15  opposition to the Hospital's motion for summary judgment and in its opposition to plaintiff's

16  motion for summary judgment.  First, the Hospital objects to specific statements in the

17  declarations of plaintiff's three experts: Drs. Mill and Ramirez and Nurse Branch as well as their

18  entire declarations.  *See* Objs. No. 1 at 2–5, 7–13; Objs. No. 2 at 2–3, 5–7.  Second, the Hospital

19  separately objects to the DHLC's 2021 Deficiencies Report on the Hospital, which the plaintiff

20  has submitted as evidence both in support of her opposition to the Hospital's motion for summary

21  judgment and in support of her own motion for summary judgment.  *See* Objs. No. 1 at 5–6; Objs.

22  No. 2 at 3–4.  Finally, the Hospital objects to plaintiff's submission of Valadez's medical records

23  as evidence in support of her motion for summary judgment.  *See* Objs. No. 1 at 6, 14.

24         The court overrules all of the Hospital's objections to plaintiff's expert declarations.  The

25  primary objection is that the experts are relying on inadmissible evidence to form their opinions.

26  *See* Objs. No. 1 at 2 (arguing Dr. Mills' report is inadmissible because he relied on inadmissible

27  evidence to form opinion) (citing *Gretzler v. Stewart*, 112 F.3d 992, 1003 (9th Cir. 1997)

28  (discussing an old Arizona rule of evidence)).  This contention flies in the face of Federal Rule of

1    Evidence 703, which explicitly allows experts to rely on inadmissible evidence "[i]f experts in the

2    particular field would reasonably rely on those kinds of facts or data in forming an opinion on the

3    subject . . . ." Fed. R. Evid. 703. The Hospital also argues the experts are relying on speculation

4    in forming their opinions, *see* Objs. No. 1 at 4–5, and that plaintiff cannot introduce facts into

5    evidence through an expert report, *see, e.g.*, Def.'s Opp'n at 18–24 (citing *In re Citric Acid Litig.*,

6    191 F.3d 1090, 1102 (9th Cir. 1999) (noting "an expert report cannot be used to prove the

7    existence of facts set forth therein")). The experts cannot establish facts for plaintiff solely

8    through their declarations. However, their opinions based upon reliable data is admissible. All

9    three experts ground their opinions on an examination of Valadez's medical records, the most

10   important of which have been submitted as evidence by both the Hospital and plaintiff, the exact

11   type of record an expert may examine to evaluate the quality of Valadez's treatment. *See* Mills

12   Decl. at 9; Ramirez Decl. at 15; Branch Decl. at 23.

13        Second, the court sustains the Hospital's objection to plaintiff's use of the DHLC

14   Deficiencies Report to support plaintiff's motion for summary judgment on the same grounds as

15   it sustained the Hospital's objections to plaintiff's request for judicial notice of the same report:

16   that plaintiff cannot use specific statements from the interviews within the report to support her

17   motion for summary judgment. *See* Objs No.1 at 5–6. However, plaintiff may rely on the

18   existence of the report as a whole to support her opposition to the Hospital's motion for summary

19   judgment, given that the Hospital's objections to the DHLC report relate only to a portion of its

20   form: that in its current state the report contains hearsay. But "to survive summary judgment, a

21   party does not necessarily have to produce evidence in a form that would be admissible at trial, so

22   long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Fraser v.*

23   *Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). The court thus denies the Hospital's objection

24   to the DHLC report to the extent plaintiff offers it in opposition to the Hospital's motion for

25   summary judgment. *See* Objs. No. 2 at 3–4.

26        Third, the Hospital objects to plaintiff's submission of Exhibits F and H in support of her

27   motion for summary judgment. *See* Objs. No. 1 at 6, 14. Exhibit F is Valadez's medical records

28   from the Hospital. *See* Pl.'s Stmt. of Evid. Ex. F (Pl.'s Med. Recs.) at 142–205, ECF No. 57-3.

7

1    Exhibit H is Valadez's medical records from Merced County.  *See* Pl.'s Stmt. of Evid Ex. H at

2    214–29.  At oral argument, the Hospital conceded that Exhibit F is identical to Valadez's Sutter

3    Health medical records, which the Hospital submitted as authenticated evidence in support of its

4    own motion for summary judgment; the Hospital dropped this objection.  *See* Def.'s Ex. B (Def.'s

5    Med. Recs.) at 40, ECF No. 51.  As to Valadez's medical records from Merced County, the

6    Hospital argues Valadez has failed to authenticate them under Federal Rule of Evidence 901(a)–

7    (b).  *See* Objs. No. 1 at 14.  The court sustains this objection for purposes of plaintiff's motion for

8    summary judgment; as a moving party, as plaintiff needs to produce evidence in admissible form

9    but plaintiff has not authenticated the Merced County records.  *See generally* Pl.'s Stmt. of Evid

10   Ex. H.  *See Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) ("Authentication is a 'condition

11   precedent to admissibility' and this condition is satisfied by 'evidence sufficient to support a

12   finding that the matter in question is what proponent claims.'") (quoting Fed. R. Evid.901(a)).

13   **III.    UNDISPUTED AND DISPUTED FACTS**

14           Unless specified below, the court construes the following facts as being undisputed.[4]  The

15   tragic events underlying this case began on Sunday, March 21, 2021, at a church in Dos Palos,

16   California.  *See* Pl.'s Stmt. of Evid. Ex. G (Ambulance Rep.) at 209; Pl.'s Stmt. of Evid. Ex. F

17   (Pl.'s Med. Recs.) at 148. Eric Valadez was there attending church with his extended family.  *See*

18   Pl.'s Med. Recs. at 148.  Unfortunately for Valadez, he experienced an emergency medical

19   episode: he began to behave in ways that threatened himself and, with a knife, cut a 4-centimeter

20   abrasion on his neck.  *See id.*; Def.'s Med. Recs. at 6.  His family contacted emergency medical

21   services, and the Dos Palos Police Department, upon hearing what had happened at the church,

22   placed Valadez on a psychiatric hold at 2:10 p.m.  *See* Ambulance Rep. at 209.  Under California

23   law, a psychiatric hold, or "5150 hold," allows the relevant county, upon probable cause, to take a

24   person into custody if that person is experiencing a "mental health disorder" who is "a danger to

---

[4] The court has compared the parties' respective statements of fact and the underlying record and reviewed the relevant deposition transcripts.  *See* Def.'s Stmt. Undisp. Mat. Facts (Def.'s SUMFs), ECF No. 48; Pl.'s Opp'n Def.'s SUMFs, ECF No. 74; Pl.'s Stmt. Undisp. Mat. Facts (Pl.'s SUMFS), ECF No. 57-2; Def.'s Opp'n Pl.'s SUMFs, ECF No. 63; Def.'s Stmt. Add'l Facts, ECF No. 64; Pl.'s Reply Def.'s Stmt. Add'l Facts, ECF No. 79; Def.'s Exs. A–C, ECF Nos. 50–52; Pl.'s Stmts. of Evid., ECF Nos. 57-3, 73; Pl.'s Exs. I–K, ECF Nos. 59–59-2; Req. Jud. Notice.

1    others, or to themselves"; the period of custody can last up to 72 hours, for purposes of

2    "assessment, evaluation, and crisis intervention."  Cal. Welf. & Inst. Code § 5150(a).

3          Valadez arrived by ambulance to Los Banos Memorial Hospital at 2:56 p.m. and was

4    admitted to the emergency department.  Def.'s Med. Recs. at 2.  The Hospital recorded his

5    "arrival complaint" as "suicidal ideation."  *See id*.  The Hospital "roomed" Valadez in the

6    emergency department hallway at 2:59 p.m., only three minutes after he arrived at the facility,

7    and the Hospital does not claim it attempted in any way to restrain him.  Def.'s Med. Recs. at 2.

8          At 3:09 p.m. nurse Anil Biviyodavid completed the initial triage on Valadez.  *See* Def.'s

9    Med. Recs. at 2.  Biviyodavid also conducted the Columbia-Suicide Severity Rating Scale—a

10   standard screening device for section 5150 patients—and found Valadez was at "No Risk" of

11   suicide.  *See* Pl.'s Med. Recs. at 175.  Valadez submits expert deposition testimony that

12   Biviyodavid's screening was inappropriate or incomplete because his "No Risk" score was

13   incorrect.  *See* Pl.'s Stmt. of Evid. Ex. B (Mills Decl.) at 10.

14         At 4 p.m., Valadez was assigned to the care of Dr. James Saunders, who evaluated

15   Valadez's "superficial abrasion" on his neck as well as his other vitals and also took a blood test.

16   *See* Pl.'s Med. Recs. at 152.  Saunders prescribed no medication for Valadez.  *See id*.  He also

17   cleared Valadez "pending tele psychiatry" evaluation and left his disposition "to be determined in

18   conjunction with telepsych."  Def.'s Med. Recs. at 6.  Valadez tested positive for alcohol and

19   opiate use.  *See* Pl.'s Med. Recs. at 153.  Valadez then waited for a psychiatric evaluation in the

20   hallway while nurses occasionally checked up on him.  *See id.* at 156–57.  At 7:00 p.m. the care

21   of Valadez shifted from Saunders to Dr. Jasmine Mahesri, who also did not prescribe Valadez any

22   medication.  *See id.* at 159.

23         The psychiatrist, Dr. Hetal Kanaiyalal Brahmbhatt, finally consulted with Valadez over

24   the phone around 11 p.m. and issued a diagnosis minutes later.  *See id.* at 168.  Brahmbhatt found

25   Valadez to be "scared, paranoid, [and] hypervigilant during the interview."  *Id.*  She evaluated

26   Valadez's suicide risk as being "high."  *Id.* at 167.  She ordered Valadez to be "on [a] 5150 hold

27   and admitted to the psych hospital for further stabilization and recovery."  *Id.* at 168.  She also

28   prescribed Risperdal, an anti-psychotic medication, as well as Zoloft.  *Id.*  There is, however, no

9

1  evidence the Hospital ever gave this medication to Valadez.  Just after midnight, early on

2  March 22, 2021, Merced County placed another 5150 hold on Valadez, who remained in the

3  hallway at the Hospital while he awaited transfer to the psychiatric hospital.  *See id.* at 188–91.

4      It is undisputed the Hospital was required to transfer Valadez because the Hospital does

5  not possess "an in-patient psychiatric unit and is not equipped to provide in-patient care for

6  patients placed on an involuntary psychiatric hold, or for whom in-patient treatment is

7  recommended."  Johnson Decl. ¶ 2, ECF No. 52.  Patients like Valadez, it says, are always

8  "transferred to a facility licensed to provide in-patient psychiatric care."  *Id.*  In other words, the

9  Hospital only provides emergency care for individuals like Valadez: ordinary, long-term care is

10  provided only after the patient has been transferred to another facility.  *See id.*

11      Just before Merced County placed the second 5150 hold, Valadez's condition worsened.

12  *See* Pl.'s Med. Recs. at 157–58.  At 11:56 p.m., an emergency room nurse reported Valadez

13  attempted to call his mother and sister, questioned why the psychiatrist knew details about his

14  personal life, and presented as paranoid.  *See id*. at 157–58.  At 12:47 a.m., a registered nurse by

15  the name of Mariana Salas reported the following:

16          Heard sound of something fallen.  Both security and [Valadez]
17          nowhere to be found.  Noticed fire extinguisher glass broken with
18          broken glass on the floor.  Security returned a few minutes later.  Per
19          security [Valadez] was pacing hallway and had hit the glass on the
20          extinguisher door twice before breaking it and fleeing the hospital.
21          Per the security guard [Valadez] did have a piece of glass on hand
22          when he fled.  Los Banos Police Department was called and notified
23          of [Valadez's] elopement.

24  Pl.'s Med. Recs. at 163; Def.'s Med. Recs. at 13.  The Los Banos police were unable to locate

25  Valadez on March 22, 2021.  Several days later, on March 27, 2021, a Los Banos resident found a

26  man hanging from a railing on a boat in his backyard.  The man was later identified as Valadez,

27  and his death was ruled a suicide.  *See* Def.'s Mem. at 4; Pl.'s Mem. at 9.

28      As noted above, plaintiff has submitted declarations from three expert witnesses who

29  examined Valadez's medical records for his stay at Los Banos Hospital.  *See* Pl.'s Stmt. of Evid.

30  Exs. B–D.  The Hospital, while objecting on evidentiary grounds to these declarations, *see supra*

10

1   Part II.C, has not rebutted plaintiff's experts' opinions with its own expert declarations.  Dr. Barry

2   Mills, a board-certified psychiatrist and licensed physician in California, submits the Hospital

3   failed to provide one-to-one observation, restrict Valadez to a safe room, or to even administer

4   Valadez psychiatric medication.  *See* Pl.'s Stmt. of Evid. Ex. B (Mills Decl.) at 10–11.  Dr. Mills

5   noted the presence of alcohol and opiates in Valadez's system "significantly increased his risk of

6   imminent danger."  *Id.* at 10**.**  Further, while Valadez met the criteria for involuntary medication,

7   the Hospital did not order involuntary medication to be administered to him.  *See id.*  The

8   Hospital also did not keep Valadez away from dangerous sharp objects like the glass that encased

9   the fire extinguisher.  *See id.*  Dr. René Ramirez, a board-certified emergency medicine physician,

10  submits the Hospital failed in its care for Valadez because it neglected to provide him with

11  "physical and chemical restraints" as a way to stabilize his condition and prevent him from

12  committing self-harm.  Pl.'s Stmt. of Evid. Ex. C (Ramirez Decl.) at 14.  According to

13  Dr. Ramirez, patients on 5150 holds "should immediately be placed under the strictest of

14  monitoring conditions" to assure "safety for themselves and others."  *Id.* at 20.  Ramirez noted the

15  Hospital failed to appreciate the "severity of [Valadez's] acute decompensated state" and also

16  noted the presence of opiates and alcohol in Valadez's system, which the Hospital had

17  documented early on in Valadez's stay.  *See id.*  Meanwhile Dan Branch, a registered nurse in

18  California with 15 years' experience, submits Valadez was not provided a safe environment for

19  someone in his condition given that the hallway had a glass-encased fire extinguisher and was

20  near an exit.  *See* Pl.'s Stmt. of Evid. Ex. D (Branch Decl.) at 23–24.  Branch also submits

21  Valadez should not have been able to walk down the hallway on his own.  *See id.*  All three

22  experts submit the Hospital's failure to provide Valadez adequate care contributed to his death.

23  *See* Mills Decl. at 10–11; Ramirez Decl. at 20; Branch Decl. at 24.

24  **IV.    LEGAL STANDARD**

25          To succeed on summary judgment, a party must show "there is no genuine dispute as to

26  any material fact and [they are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

27  dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."

28  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect

1   the outcome of the suit under the governing law." *Id.*  "[M]ere allegation and speculation do not

2   create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d

3   1075, 1081–82 (9th Cir. 1996) (citing *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995)).  The

4   court views the record in the light most favorable to the non-moving party and draws reasonable

5   inferences in their favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–

6   88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[t]rial courts should act . . .

7   with caution in granting summary judgment . . . [and] the trial court may . . . deny summary

8   judgment in a case where there is reason to believe that the better course would be to proceed to a

9   full trial." *Anderson*, 477 U.S. at 255.

10   **V.    ANALYSIS**

11       **A.    EMTALA (Claim Two)[5]**

12       Congress enacted EMTALA to prevent Medicare-participating hospitals from refusing to

13   care for, or "dumping," unwanted emergency room patients.  *See Baker v. Adventist Health, Inc.*,

14   260 F.3d 987, 993 (9th Cir. 2001).  It is undisputed the Hospital is subject to EMTALA's

15   requirements.  The statute mandates two requirements: first, hospitals must provide an

16   "appropriate medical screening examination within the capability of the hospital's emergency

17   department, including ancillary services routinely available to the emergency department."

18   42 U.S.C. § 1395dd(a).  Second, if the "hospital determines that the individual has an emergency

19   medical condition, the hospital must provide either . . . such further medical examination and such

20   treatment as may be required to stabilize the medical condition or . . . for transfer of the individual

21   to another medical facility . . . ."  42 U.S.C. § 1395dd(b).  Plaintiff alleges the Hospital failed both

22   to screen and stabilize Valadez.

23           **1.    Duty to Screen**

24       The Hospital would be liable under EMTALA if it had failed to abide by its own

25   screening procedures when it treated Valadez.  *See Baker*, 260 F.3d at 993.  It would violate

_____

        [5] The court takes plaintiff's claims out of order as it finds plaintiff's ADA, Unruh Act and
CDPA Act claims all allege Valadez was deprived of an accommodation based on his disability;
they are related claims and should be addressed in the order set forth below.

1    EMTALA if it did not provide a screening of Valadez "comparable to that offered to other

2    patients with similar symptoms." *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1255

3    (9th Cir. 2001). However, EMTALA's duty to screen requirement is not a substitute for medical

4    malpractice, as EMTALA does not "impose on hospitals a national standard of care in screening

5    patients." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995). The standard of

6    care—whether or not the screen performed by the Hospital was done correctly—is instead the

7    province of state tort law. *See id.* However, if a screen is "so cursory that it is not 'designed to

8    identify acute and severe symptoms that alert the physician of the need for immediate medical

9    attention to prevent serious bodily injury,'" the Hospital may have failed in its duty to screen

10   Valadez. *Jackson*, 246 F.3d at 1256 (quoting *Eberhardt*, 62 F.3d at 1257).

11        It is undisputed the Hospital screened Valadez almost immediately after he arrived. Nurse

12   Biviyodavid screened Valadez and noted in Valadez's medical records use of the Columbia-

13   Suicide Severity Rating Scale as a part of the screen. *See* Pl.'s Med. Recs. at 175. Plaintiff does

14   not argue this was the incorrect screening device for section 5150 patients. Plaintiff also does not

15   argue that, if administered properly, the Columbia-Suicide Severity Rating Scale would not be so

16   cursory as to effectively be incapable of identifying Valadez's symptoms. *See Jackson*, 246 F.3d

17   at 1256. Further, the Hospital points out plaintiff has provided no evidence of disparate

18   treatment. *See* Def.'s Opp'n at 24.

19        Instead, plaintiff argues nurse Biviyodavid simply checked a box that he used the

20   Columbia-Suicide Severity Rating Scale but did not actually screen Valadez properly. Plaintiff

21   bases this argument on Biviyodavid's making a mistake when he declared Valadez was not a

22   suicide risk. Pl.'s Mem. at 19–20; Pl.'s Opp'n at 9–10. Plaintiff also provides expert testimony

23   from Dr. Mills who suggests the screen was incomplete based on the mistakes he believes

24   Biviyodavid made. *See* Mills Decl. at 10; Mills Dep. at 15–16 ("I mean, I – they scored [The

25   Columbia-Suicide Severity Rating Scale] very wrong I think someone just put – checked that they

26   did it and didn't really do it."). But Mills' only opinion for why the screen was incomplete was

27   that Biviyodavid came to the wrong conclusion regarding Valadez's risk of self-harm. *See* Mills

28   Dep. at 15–16. Mills' belief that the screen was not done is speculative and speculation alone

1    cannot establish a dispute of material fact.  *See Nelson*, 83 F.3d at 1081–82 (citing *Witherow*,

2    52 F.3d at 266).  Plaintiff did not, for example, depose Biviyodavid or provide any other factual

3    basis from which a reasonable factfinder could infer Biviyodavid did not use the Columbia-

4    Suicide Severity Rating Scale to assess Valadez.

5        Further, plaintiffs' own expert, Dr. Ramirez, seemed to suggest in his deposition the

6    Hospital initially screened Valadez when he stated, "So the patient was – it seemed like he was

7    screened in the initial screening exam, even the nurse note[d] on the intake, one of the

8    questionnaires I recall stuck out to me was this patient presented with a suicidal gesture . . . ."

9    Ramirez Dep. at 22.  Upon further questioning regarding whether Valadez had an appropriate

10   screening exam, Ramirez responded, "He had an initial screening exam, and then he did not have

11   an appropriate stabilization."  *Id.* at 22–23.  Pressed again on the question of screening, Ramirez

12   stated, "The patient was screened and within that screening it was uncovered that the patient did

13   not feel safe going home, that he presented for a suicidal gesture, and the ER doctor also agreed

14   that the patient was a danger to himself."  *Id.* at 23.  Dr. Ramirez also suggested in his deposition

15   the Hospital should have conducted a new screen when Valadez's symptoms deteriorated after

16   11 p.m. on March 21, 2021.  *See id.* at 32.

17       Nothing, however, in the statutory text of EMTALA suggests a patient needs to be

18   screened twice.  As the Hospital points out, plaintiff is really asking the court to apply a national

19   standard of care for screening and punish the Hospital because of Biviyodavid's alleged

20   negligence in misdiagnosing Valadez's condition, something EMTALA does not require.  *See*

21   Def.'s Opp'n at 19 (citing *Jackson*, 246 F.3d at 1248).  While Biviyodavid appears to have made

22   a mistake by stating Valadez was not a suicide risk at the time of screening, the Hospital was

23   otherwise on actual notice—from the time Valadez arrived up to the time he fled—that Valadez

24   was at risk of self-harm.  *See* Def.'s Med. Recs. at 2; Pl.'s Med. Recs. at 167–68.  The Hospital

25   had no need to rescreen Valadez when his condition worsened as at that point he had received a

26   full diagnosis from a psychiatrist, Dr. Brahmbhatt.  *See* Pl.'s Med. Recs. at 167–68.  In short,

27   there is no undisputed evidence to support the conclusion the initial screen of Valadez was a

28   determinative problem.  Instead, the problem with the care Valadez received arguably lay with

14

1    the Hospital's failure to stabilize Valadez before transferring him.  The court turns to the

2    Hospital's duty to stabilize.

3                    **2.    Duty to Stabilize**

4            EMTALA requires the Hospital, when it determines a patient like Valadez has an

5    emergency medical condition, to provide either "such further medical examination and such

6    treatment as may be required to stabilize the medical condition, or . . . for transfer of the

7    individual to another medical facility."  42 U.S.C. § 1395dd(b)(1)(A)–(B).  But in order to

8    transfer a patient under EMTALA, the Hospital must first stabilize the patient; thus EMTALA

9    generally requires stabilizing emergency care.  *See* 42 U.S.C. § 1395dd(c)(1).  "Stabilization" is

10   defined as providing "such medical treatment of the condition as may be necessary to assure,

11   within reasonable medical probability that no material deterioration of the condition is likely to

12   result from or occur during the transfer of the individual from a facility . . . ."

13   42 U.S.C. § 1395dd(e)(3)(A).

14           To succeed on a failure to stabilize claim, plaintiff ultimately must show, first, Valadez

15   had an emergency condition, and, second, the Hospital had actual knowledge of Valadez's

16   emergency condition.  *See Eberhardt*, 62 F.3d at 1259 ("[T]he hospital's duty to stabilize the

17   patient does not arise until the hospital first detects an emergency medical condition.").  Third,

18   plaintiff must also show the Hospital's failure to stabilize took place during emergency or

19   observational care and not after Valadez had been transitioned to inpatient care.  *See Bryant v.*

20   *Adventist Health Sys./West*, 289 F.3d 1162, 1167 (9th Cir. 2002) ("We hold that the stabilization

21   requirement normally ends when a patient is admitted for inpatient care."); *see also Bryan v.*

22   *Rectors and Visitors of Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996) (EMTALA only covers

23   stabilizing treatment "in connection with a possible transfer" and not "long-term care within the

24   system").  And fourth, plaintiff must show the Hospital did not provide medical treatment

25   necessary to assure a material deterioration was unlikely to result from a transfer.  *See*

26   42 U.S.C. § 1395dd(e)(3)(A).

27           As to the fourth element, this court agrees with a sister district judge that EMTALA's duty

28   to stabilize includes proper monitoring and restraint of psychiatric patients suffering from suicidal

                                            15

1    ideation.[6]  In *Harmon v. Uintah Basin*, for example, the complaint alleged plaintiff suffered from

2    suicidal ideation and was admitted to a hospital for observational purposes.  2021 WL 2532826,

3    at *1.  While being observed, the plaintiff's condition worsened.  *Id.*  The hospital then attempted

4    to transfer him to a better qualified care facility.  *Id.*  The hospital did not give the patient

5    stabilizing medication, but instead transported him by private vehicle accompanied not by a

6    person trained in managing a suicidal person but instead by "one able-bodied person, an 80-year-

7    old woman, and a man who was and is paraplegic."  *Id.*  The plaintiff, who was neither sedated

8    nor restrained, attempted suicide by jumping out of the moving car while it was travelling 65

9    miles per hour on the highway.  *Id.*  He survived, but with severe and permanent injuries.  *Id.*  The

10   district court, in denying a motion to dismiss, found the plaintiff had a plausible claim under

11   EMTALA's duty to stabilize requirement because the hospital allegedly did not give the plaintiff

12   stabilizing care and did not properly monitor the plaintiff.  *Id.* at *6-7.  The court finds the

13   reasoning of the district court in *Harmon* persuasive because, absent proper monitoring and

14   restraint, a patient suffering from suicidal ideation is at high risk of attempted self-harm and

15   likely to experience a material deterioration in medical condition.  *See* 42 U.S.C.

16   § 1395dd(e)(3)(A).

17         In its supplemental briefing, the Hospital argues *Harmon* differs from the case at bar

18   because the type of harm the court addressed in that case arises "when a patient is actually

19   transferred."  Def.'s Suppl. Brief at 2.  While recognizing the distinction in factual circumstances,

20   the court is not persuaded those differences matter for the principle the court in *Harmon*

21   articulates: that the duty to stabilize includes requiring hospital staff to monitor and restrain a

22   patient suffering from suicidal ideation pending completion of transfer.

23         Applying the law related to stabilization, for the first element, the parties do not dispute

24   Valadez had an emergency condition.  *See Eberhardt*, 62 F.3d at 1257–59 (applying EMTALA

---

[6] The court also takes judicial notice on its own motion of the Office of Inspector General's 2017 investigation of and settlement with Covenant Medical Center in Waterloo, Iowa over alleged EMTALA violations including discharging a woman experiencing thoughts of suicidal ideation and failing to restrain another patient whose mind was "disturbed," allowing him to elope and eventually die from exposure.  *See https://oig.hhs.gov/fraud/enforcement/iowa-hospital-settles-case-involving-a-patient-dumping-allegations/* (accessed June 13, 2025).

1   stabilization requirement to a psychiatric condition); *see also* 42 C.F.R. § 489.24(b)(1) (listing

2   psychiatric disturbances as an example of an emergency medical condition under EMTALA).

3   For the second element, the parties also do not dispute the Hospital was aware of Valadez's

4   emergency condition.  He arrived on a 5150 hold with complaints of suicidal ideation and a self-

5   inflicted knife wound on his neck.  *See* Def.'s Med. Recs. at 2.  Another 5150 hold was placed

6   after 11 p.m., after the treating psychiatrist evaluated him as a having a high suicide risk.  *See*

7   Pl.'s Med. Recs. at 167–68.  For the third element, it also is undisputed the Hospital did not

8   provide Valadez "inpatient care."  *See Bryant*, 289 F.3d at 1167.  The Hospital has submitted it

9   did not have the facilities or expertise to provide long-term care.  *See* Johnson Decl. ¶ 2.  Valadez

10  either only received emergency care at the Hospital or some type of observational care and

11  neither one exempts the Hospital from EMTALA's stabilization requirements.  *See Harmon*,

12  2021 WL 2532826, at *5–6 (collecting authority on observational care under EMTALA).  Further

13  the parties do not dispute Valadez was going to be transferred to a psychiatric hospital, as

14  required.  *See* Pl.'s Med. Recs. at 168.  Thus, the Hospital indisputably had a duty to stabilize

15  Valadez until it transferred him.

16      For the fourth element, the court finds it is undisputed the Hospital failed to provide

17  stabilizing care to Valadez.  The court makes this finding using Valadez's medical records and

18  Valadez's three unrebutted expert reports evaluating his medical records.  The Hospital placed

19  Valadez, who was suffering from suicide ideation and who had committed self-harm with a knife

20  less than an hour before his arrival, in a hallway containing a glass-encased fire extinguisher.  *See*

21  Def.'s Med. Recs. at 2, 13; Pl.'s Med. Recs. at 163.  Further, the Hospital placed Valadez in the

22  hallway, in spite of two 5150 holds and a diagnosis by its own psychiatrist that he presented a

23  high risk of self-harm and harm to others.  *See* Def.'s Med. Recs. at 2; Pl.'s Med. Recs. at 167–68.

24  There is no evidence Valadez received medicine to stabilize his condition even though

25  Dr. Brahmbhatt prescribed Valadez Risperdal and Zoloft.  *See* Pl.'s Med. Recs. at 168.  There is

26  undisputed evidence his condition worsened during his stay at the Hospital.  *See* Pl.'s Med. Recs.

27  at 157–58.  There is no evidence Valadez was restrained at any point during his stay.  Further, a

28  security guard monitoring Valadez allowed him to pace the hallway even after a second 5150

1    hold had been placed on him for suicide ideation. *See* Def.'s Med. Recs. at 13; Pl.'s Med. Recs.

2    at 163.  Examining these facts, three experts opine the Hospital did not supervise Valadez

3    properly and placed him in a dangerous hallway that made it likely he would commit self-harm.

4    *See generally* Mills Decl.; Ramirez Decl.; Branch Decl.  Plaintiff's experts submit the Hospital

5    should have provided psychiatric medication and possibly physical restraints to keep Valadez safe

6    especially as the Hospital knew Valadez had opiates and alcohol in his system, which made his

7    psychiatric condition even more unstable. *See generally* Mills Decl., Ramirez Decl., Branch

8    Decl.  The Hospital, meanwhile, has not provided any of its own expert testimony that might

9    rebut or counter plaintiff's experts.

10    Finally, the court finds there is no dispute of material fact as to causation.  Dr. Mills, after

11    evaluating Valadez's medical records, has opined that "[a]bsent immediate, appropriate

12    intervention, the potential for a poor outcome of this patient was quite foreseeable."  Mills Decl.

13    at 10.  Mills concluded the Hospital's "denial of access to adequate psychiatric care, caused

14    [Valadez's] injury and death." *Id.* at 11.  Dr. Ramirez, similarly, after evaluating Valadez's

15    medical records, opined the "denial of access to psychiatric care and emergency treatment in this

16    case caused the elopement from the hospital and untimely death of [Valadez]."  Ramirez Decl. at

17    20.  Nurse Branch, after evaluating the same medical records, opined that "Valadez's desire for

18    self-harm and subsequent elopement was foreseeable and preventable in my opinion."  Branch

19    Decl. at 24.  Branch concluded "[t]he lack of any treatment to stabilize his condition and the

20    inability of the staff to provide Mr. Valadez a safe and secure environment directly contributed to

21    his death." *Id*.  These three experts' opinions, in short, makes it more likely than not Valadez's

22    injury was a result of the Hospital's failure to stabilize him. *See Jennings v. Palomar Pomerado*

23    *Health Sys.*, *Inc.*, 114 Cal. App. 4th 1108, 1118 (2003) (plaintiff must produce "evidence from

24    which reasonable [people] may conclude that it is more probable that the event was caused by the

25    defendant than it was not" (quoting *Osborn v. Mem'l Blood Bank*, 5 Cal. App. 4th 234, 253

26    (1992) (alterations in original)).

27    The Hospital makes four arguments for why the court should either grant it summary

28    judgment on plaintiff's duty to stabilize claim or deny plaintiff's motion for summary judgment

1  on the same claim.  First, the Hospital argues none of the evidence plaintiff has submitted is

2  admissible.  *See* Def.'s Opp'n at 16–24.  The court has addressed this argument above, and finds

3  otherwise, in relevant part.  *See supra* Part II.C.  Second, the Hospital argues the court can only

4  evaluate EMTALA's stabilization requirements if a patient is transferred or discharged.  Def.'s

5  Mem. at 11.  Third, the Hospital argues it provided Valadez stabilizing treatment.  *See id.* at 13–

6  14.  And fourth, the Hospital argues plaintiff has failed to show causation linking the Hospital's

7  alleged failure to stabilize to Valadez's death.  *See id.* at 14.  The court addresses the last three

8  arguments below.

9        The court finds the Hospital's second argument unconvincing.  The Hospital effectively

10  asks the court to create, in essence, a "dump in the hallway" carve out to EMTALA's stabilization

11  requirement.  The Hospital did not discharge Valadez, and it did not manage to transfer him

12  before he escaped.  Because the Hospital was not discharging or transferring Valadez at the time

13  he fled the premises, the Hospital argues it cannot be held liable for failing to stabilize him.  *See*

14  *id.* at 11.  This argument ignores the plain language of EMTALA, which requires hospitals to

15  provide either stabilizing care or a transfer provided the patient is stabilized.  *See* 42 U.S.C.

16  § 1395dd(b)(1)(A)–(B).  As the Ninth Circuit has noted, quoting the Fourth Circuit's decision in

17  *Bryant*:

18           The stabilization requirement is . . . defined entirely in connection
19           with a possible transfer and without reference to the patient's long-
20           term care within the system.  It seems manifest to us that the
21           stabilization requirement was intended to regulate the hospital's care
22           of the patient only in the immediate aftermath of the act of admitting
23           her for emergency treatment and while it considered whether it
24           would undertake longer term full treatment or instead transfer the
25           patient to a hospital that could and would undertake that treatment.

26  *Bryant*, 289 F.3d at 1167 (quoting *Bryan*, 95 F.3d at 352).  Here, the Hospital effectively admits it

27  gave Valadez only emergency care in the less than 24 hours after it admitted him with suicidal

28  ideation on a 5150 hold and before a planned transfer.  *See* Johnson Decl. ¶ 2.  Its failure to

29  stabilize Valadez then, falls well within the emergency treatment time frame during which

30  EMTALA requires stabilization as envisioned by the courts in both *Bryant* and *Bryan*, given that

31  the care was "in connection with a possible transfer."  *See Bryant*, 289 F.3d at 1167 (quoting

1    *Bryan*, 95 F.3d at 352) (noting stabilization is required "in the immediate aftermath of the act of

2    admitting [a patient] for emergency treatment and while it considered whether it would undertake

3    longer term full treatment or instead transfer the patient to a hospital that could and would

4    undertake that treatment"). Until Valadez was transferred or discharged, the Hospital was

5    required to provide stabilizing care. *See id.*

6          The Hospital's third and fourth arguments are also unavailing. The Hospital argues it

7    provided stabilizing care because Valadez was "placed on a 5150 hold and monitored." Def.'s

8    Mem. at 13; *see also* Def.'s Opp'n at 26 ("The undisputed facts show that [Valadez] was

9    monitored regularly while at [the Hospital] while awaiting transfer."). But the Hospital has not

10   provided any expert report to substantiate this position, and the undisputed evidence supports the

11   opposite conclusion. Valadez's three experts also concluded he was not monitored effectively.

12   *See generally* Mills Decl.; Ramirez Decl.; Branch Decl. Any reasonable factfinder would

13   conclude, as a consequence of undisputed facts regarding the Hospital's treatment, Valadez's

14   condition would have been reasonably likely to deteriorate during the transfer. Under these

15   circumstances, it is obvious Valadez could have engaged in serious self-harm by cutting himself

16   with the fire extinguisher case's glass or seriously injuring himself in an attempt to escape. As in

17   *Harmon*, Valadez did not receive stabilizing medication as the Hospital's psychiatrist prescribed

18   and was not supervised properly or restrained. *See Harmon*, 2021 WL 2532826, at *6. Fourth,

19   the Hospital has provided no evidence to rebut plaintiff's three experts who all concluded the

20   Hospital's failure to provide stabilizing emergency care caused Valadez's suicide.

21         In sum, the court grants the Hospital's motion for summary judgment on plaintiff's

22   EMTALA claim on the theory it failed to screen Valadez. The court denies the Hospital's motion

23   for summary judgment on plaintiff's EMTALA claim on the theory the Hospital failed to stabilize

24   Valadez. The court denies plaintiff's motion for summary judgment on her EMTALA claim on

25   the theory the Hospital failed to screen Valadez. The court grants plaintiff's motion for summary

26   judgment on her EMTALA claim on the theory the Hospital failed to stabilized Valadez.

27   /////

28   /////

20

1          **B.      ADA (Claim One)**

2          To prove a violation of Title III of the ADA, plaintiff must show (1) Valadez was

3  disabled; (2) the Hospital is a private entity that operates a place of public accommodation; and

4  (3) the Hospital denied public accommodations on account of Valadez's disability.  *Arizona ex*

5  *rel. Goddard v. Harkins Amusement Enters. Inc.*, 603 F.3d 666, 670 (9th Cir. 2010) (citing *Molski*

6  *v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007)).  Plaintiff must also show the Hospital

7  denied Valadez access because of his disability in light of the Ninth Circuit's pronouncement that

8  "the ADA prohibits discrimination because of disability, not inadequate treatment for disability."

9  *See Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overturned in part on other*

10  *grounds*, *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc) (citing *Bryant*

11  *v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("The ADA does not create a remedy for medical

12  malpractice.")).

13          The Hospital does not dispute Valadez was disabled within the meaning of the ADA and

14  the Hospital does not dispute it is a place of public accommodation under the ADA.  *See* Def.'s

15  Mem. at 15; Def.'s Opp'n at 12–13.  The dispute rests on the third element of the ADA claim:

16  whether the Hospital denied public accommodations on account of Valadez's psychiatric

17  disorder.

18          Plaintiff argues the Hospital's treatment of Valadez violated Title III of the ADA because

19  it did not hold him in a quiet or safe room designed to protect patients suffering from suicidal

20  ideation, did not provide him with one-on-one care, and did not give him medication that would

21  have alleviated his illness.  Pl.'s Mem. at 15; Pl.'s Reply at 4–5.  The Hospital argues that even

22  taking all these facts as true, plaintiff's ADA claim fails because the ADA does not create liability

23  for medical malpractice claims: in other words, a plaintiff has an actionable ADA claim when he

24  is denied access to accommodations based on disability, not when he is negligently treated for the

25  disability.  Def.'s Mem. at 15 (citing *Simmons*, 609 F.3d at 1022).

26          The court agrees plaintiff has no actionable ADA claim.  As the Hospital notes, almost

27  everyone admitted for medical treatment can claim some kind of disability.  Def.'s Opp'n at 13.

28  Under plaintiff's ADA theory, almost every malpractice case could or would turn into an ADA

1    case.  *See id*.  While the cases the Hospital points to involve Title II ADA claims and not Title III

2    ADA claims, they are nevertheless persuasive as the court sees no reason why the Ninth Circuit

3    would allow a Title III ADA claim that is in effect a medical malpractice claim when it has barred

4    similar claims under Title II of the ADA.  *See, e.g.*, *Simmons*, 609 F.3d at 1022.  Further, while

5    plaintiff argues the Hospital should have accommodated Valadez with a quiet room, medication,

6    and one-on-one supervision, *see* Pl.'s Mem. at 15, Pl.'s Reply at 4–5, she points to no cases or

7    administrative regulations that suggest the Hospital was required to provide such an

8    accommodation.

9        The court grants the Hospital's motion for summary judgment on plaintiff's ADA claim

10   and denies plaintiff's motion for summary judgment on that claim.

11       **C.    Unruh Act (Claim Three)**

12       California's Unruh Act applies to business establishments "that offer to the public

13   'accommodations, advantages, facilities, privileges, or services.'"  *North Coast Women's Care*

14   *Med. Grp., Inc. v. Sup. Ct.*, 44 Cal. 4th 1145, 1153 (2008) (quoting Cal. Civ. Code § 51(b)).  Its

15   antidiscrimination provisions subject to liability anyone who "denies . . . or incites a denial, or

16   makes any discrimination or distinction contrary to [the Act]."  *Id.* (quoting Cal. Civ. Code

17   § 52(a)).  Proving a Title III ADA claim is sufficient to prove an Unruh Act claim, *see* Cal. Civ.

18   Code § 51(f), but even though plaintiff failed to show an ADA violation in this case, she can still

19   prove an Unruh Act claim by showing the Hospital intentionally discriminated against Valadez by

20   denying him public accommodations, *see Minton v. Dignity Health*, 39 Cal. App. 5th 1155, 1162

21   (2019) (quoting *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 854 (2005)).

22       The parties do not dispute that Valadez had a qualified disability under the Unruh Act.

23   And medical establishments like the Hospital who provide services to the public are considered

24   businesses for the purposes of the Unruh Act.  *See Leach v. Drummond Med. Grp. Inc.*, 144 Cal.

25   App. 3d 362, 370–71 (1983).  Plaintiff relies solely on her contention the Hospital violated the

26   ADA to prove her Unruh Act claim.  *See* Pl.'s Mem. at 25.  As the court has found there is not a

27   disputed material fact that would allow plaintiff to bring her ADA claim against the Hospital to

28   trial, it also finds there is no disputed material fact that would allow plaintiff to bring her Unruh

1   Act to trial under this theory of liability.  Further, as with her ADA claim, plaintiff has not cited

2   any cases or California regulations that would suggest the Hospital violated the Unruh Act by

3   failing to provide Valadez proper medical treatment.  While plaintiff has provided evidence that

4   points to the Hospital's negligence when treating Valadez, she has not provided sufficient

5   evidence to create a dispute of material fact that the Hospital intentionally discriminated against

6   Valadez.  *Cf. Minton*, 39 Cal. App. 5th at 1162–64 (reversing demurrer after finding plaintiff's

7   Unruh Act claim to be plausible, that hospital intentionally denied providing plaintiff

8   hysterectomy owing to his being a transgendered man).

9       The court grants the Hospital summary judgment on plaintiff's Unruh Act claim and

10   denies plaintiff's motion for summary judgment on that claim.

11       **D.      CDPA (Claim Four)**

12       The CDPA provides "[i]ndividuals with disabilities or medical conditions have the same

13   right as the general public to the full and free use of . . . public buildings, medical facilities . . .

14   public facilities, and other public places."  Cal. Civ. Code § 54.  CDPA claims can only be made

15   relating to a denial of physical access to a building and not to the denial of services.  *See Bax v.*

16   *Doctors Med. Ctr. of Modesto, Inc.*, 393 F. Supp. 3d 1000, 1011 (E.D. Cal. 2019); *see also Fetter*

17   *v. Bonner*, No. 12-2235, 2015 WL 164268, at *5 (E.D. Cal. Jan. 13, 2015); *Wilkins-Jones v.*

18   *County of Alameda*, 859 F. Supp. 2d 1039, 1054 (N.D. Cal. 2012).  Here, plaintiff argues only

19   that Valadez was denied services: proper medication, a proper room based on his disability, and

20   proper supervision.  *See* Pl.'s Mem. at 26.  Plaintiff claims the Hospital violated the CDPA

21   because it also violated the ADA.  *See id.*  But, as noted above, the court has granted the Hospital

22   summary judgment on plaintiff's ADA claim, and even if it had not, the ADA claim would still

23   need to involve the denial of physical access to a building if plaintiff's CDPA claim were to

24   survive summary judgment.  The only physical denial plaintiff alleges is the Hospital's failure to

25   provide Valadez with a safe room.  *See* Pl.'s Opp'n at 14; Pl.'s Reply at 4–5.  Here as well

26   plaintiff has not provided the court with any case that would show the Hospital is required by the

27   CDPA to provide patients suffering from suicidal ideation a specific room as opposed to being

28   /////

1  required to provide physical access to the building generally.  As plaintiff has failed to allege

2  Valadez was denied physical access to a building or facility, her CDPA claim must fail.

3      The Hospital's motion for summary judgment on plaintiff's CDPA claim is granted and

4  plaintiff's motion for summary judgment on that claim is denied.

5  **VI.    CONCLUSION**

6      For the reasons provided above, the court:

7  - With respect to clarifying the evidentiary record:

9  - o **Grants** plaintiff's request for judicial notice (ECF No. 58) as follows: the
10    court takes judicial notice of the existence of the report, but it does not take
11    judicial notice of the interviews embedded within the report or the
12    conclusions based on those interviews because as currently constituted they
13    contain hearsay and the specific statements within the report are disputable.

15  - o **Sustains** the Hospital's objection to plaintiff's using the information
16    obtained from interviews in the DHLC report for her motion for summary
17    judgment.

19  - o **Sustains** the Hospital's objection to plaintiff's using Valadez's medical
20    records from Merced County to support her motion for summary judgment.

22  - o **Overrules** the Hospital's objections to plaintiff's using the existence of the
23    DHLC report in opposition to the Hospital's motion for summary
24    judgment.

25  - o **Overrules** all of the Hospital's other objections.

27  - o **Grants** the Hospital's motion to strike plaintiff's submission of additional
28    material facts in support of her motion for summary judgment (ECF No.
29    82).

30  - **Grants** the Hospital's motion for summary judgment (ECF No. 46) on the

31  following claims:

32  - o The plaintiff's ADA claim (claim one).

33  - o The plaintiff's EMTALA claim on the theory the Hospital violated its duty

34    to screen (claim two).

35  - o The plaintiff's Unruh Act claim (claim three).

36  - o The plaintiff's CDPA claim (claim four).

1    • **Denies** the Hospital's motion for summary judgment on plaintiff's EMTALA claim
2        on the theory the Hospital violated its duty to stabilize (ECF No. 46).
3    • **Grants** plaintiff's motion for summary judgment on her EMTALA claim on the
4        theory the Hospital failed to stabilize (claim two) (ECF No. 57).
5    • **Denies** the remainder of plaintiff's motion for summary judgment (ECF No. 57).
6    • **Dismisses** all DOE defendants without prejudice.
7    • A final pretrial conference is set for **August 21, 2025**. The parties shall meet and
8        confer and file a joint status report 7 days prior to the final pretrial conference
9        addressing all matters the court should consider in issuing the final pretrial order,
10        including whether they request referral to a magistrate judge to conduct a further
11        court-convened settlement.  *See*  E.D. Cal. L.R. 281–282; Fed R. Civ. P. 16.
12    This order resolves ECF Nos. 46, 57, 58, 82.
13        IT IS SO ORDERED.
14    DATED:  July 2, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE

25